# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

| | | |
|---|---|---|
| In re Teflon Products Liability Litigation, **MDL NO. 1733** | : : : | **CASE NO.: 4:06-cv-00194-REL-CFB** |
| | | |
| STEPHEN A. SHAFFER, SUZAN SHAFFER, and JOSEPH O'DONOGHUE on behalf of themselves, and all others similarly situated, | : : : : : : | Previous Case No. 1:05-cv-5274 (USDC NJ) **AMENDED COMPLAINT COMPLAINT –** |
| Plaintiffs, | : : | **CLASS ACTION** |
| v. | : : | **JURY TRIAL DEMANDED** |
| E.I. DUPONT DE NEMOURS & COMPANY, | : : : | |
| Defendant. | : : | |

Class Representative Plaintiffs STEPHEN A. SHAFFER, SUZAN SHAFFER, and JOSEPH O'DONOGHUE, on their own behalf and on behalf of all others similarly situated, by and through their undersigned counsel, allege the following, based upon the investigation of Plaintiffs' counsel, upon information and belief (including the belief that substantial additional evidentiary support will exist for the allegations set forth herein after discovery has been completed in this case), against Defendant E.I. DUPONT DE NEMOURS & COMPANY ("DuPont"):

## I.      INTRODUCTION

1.      This is a class action seeking monetary and other relief arising from DuPont's deceptive and misleading trade practices, and its making of fraudulent, false, misleading, deceptive, and unconscionable material misrepresentations and omissions to the consuming

public concerning the potential for serious public health, safety and welfare issues resulting from its manufacture and sale for over fifty (50) years of a product commonly known as "Teflon." Cooking products containing Teflon can release harmful and dangerous substances, including a chemical that has been determined to be "likely" to cause cancer in humans.

2.    DuPont manufactured and distributed Teflon when it knew or should have known that Teflon contains substances that were dangerous and harmful to the public, which substances can be released when cooking products made with Teflon are used for their intended purposes.

3.    This action is brought to require DuPont: (i) to pay damages to the Plaintiff Class Representatives and other Class Members who purchased or otherwise acquired cooking products containing DuPont's Teflon product; (ii) to create a fund for ongoing medical monitoring of consumers who have purchased cooking products containing Teflon; (iii) to create a fund for independent scientific researchers to further investigate the potential for adverse health effects to consumers who have used cooking products containing Teflon; (iv) to require that DuPont cease and desist from the manufacture, sale, and distribution of cooking products containing Teflon, which products cause the potential adverse and harmful effects complained of herein below; and (v) to replace and/or exchange all existing products containing Teflon possessed by Class members with similar products containing non-hazardous "non-stick" cooking substances, or provide the monetary equivalent thereof.

## II.    JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction pursuant to 28 U.S.C.A. §1332 (a)(1) and (d)(2) in that this action seeks monetary relief in excess of $5,000,000.00, exclusive of interest, costs and attorney's fees and is between citizens of different states.

5.      Venue is appropriate in this judicial circuit pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims outlined herein occurred in the District of New Jersey.

### III.     REPRESENTATIVE CLASS PLAINTIFFS

6.      Plaintiff, Stephen A. Shaffer, resides at 1036 Society Hill Blvd., Cherry Hill, New Jersey, 08003, and at all times material hereto, was a consumer of cooking products containing or made with DuPont's Teflon product.

7.      Plaintiff, Suzan Shaffer, resides at 1036 Society Hill Blvd., Cherry Hill, New Jersey, 08003, and at all times material hereto, was a consumer of cooking products containing or made with DuPont's Teflon product.

8.      Plaintiff, Joseph O'Donoghue, resides at 836 Corgie Street, Cape May, New Jersey, 88204, and at all times material hereto, was a consumer of cooking products containing or made with DuPont's Teflon product.

### IV.     DEFENDANT

9.      DuPont is a Delaware corporation. DuPont sells or distributes Teflon throughout the State of New Jersey.

10.     DuPont is in the business of manufacturing and supplying Teflon for distribution, marketing, wholesaling and retailing in various products made for consumer use. Included among these products are housewares, household appliances, and cooking products such as pots and pans.

### V.     BACKGROUND AND GENERAL ALLEGATIONS

11.     DuPont was founded in 1802.

12.     DuPont operates in more than seventy (70) countries.

13.     Teflon was invented in 1938 at DuPont's Jackson Laboratory.

3

14.     Teflon is DuPont's trademarked name for the chemical polytetrafluoroethylene (PTFE).

15.     DuPont has registered the Teflon trademark in 19 countries and first began selling Teflon commercially in 1946.

16.     As DuPont proudly boasts in its Teflon website:

> Teflon is really everywhere. Not only can you find it in your
> clothes and on your cookware, but you can also find it on products
> on almost every continent.

17.     Teflon is commonly found in "non-stick" cooking products, such as in pots and pans, stir fryers and woks, pizza pans, breadmakers, cookie sheets, griddle pans and skillets, wafflers, deep fryers, crock pots, roasting pans, cake pans and molds, and other common cooking utensils and aids.

18.     Teflon and the chemicals used in its production represent a $2 billion per year industry.

19.     DuPont nets an estimated $200 million per year from its sale of Teflon.

20.     DuPont has advertised and represented to the public that Teflon makes life easy, and reportedly has called Teflon a "housewife's best friend."

21.     DuPont claims on its Teflon website that "the Teflon brand is one of the world's most recognized and respected of all ingredient brands" and that Teflon enhances consumer recognition.

22.     During the last fifty (50) years, DuPont's scientists have studied whether products containing Teflon are safe for use by consumers. DuPont has continually represented to consumers in public statements and documents, in press releases and on its websites that Teflon is safe for consumer use and has denied that the use of cooking products containing Teflon can be harmful to human health.

23.     As a result of DuPont's long-term and pervasive marketing and advertising of Teflon and Teflon-coated products, Teflon has acquired a reputation within the general consuming public as being a safe and healthy product.

24.     Perflourooctanoic acid ("PFOA") is a perflourinated detergent/surfactant that is manufactured, processed, and/or distributed by DuPont in connection with its manufacture of Teflon.  PFOA is also sometimes referred to by DuPont as C-8.

25.     PFOA is the chemical used to give Teflon its "non-stickiness."

26.     PFOA is a liver toxin in animals, is biopersistent in humans and animals and bioaccumulative in humans.

27.     PFOA is associated with other health concerns in animals, including cancer and developmental defects.

28.     PFOA is not naturally occurring but is nonetheless found to contaminate the blood of humans in all geographic regions of the United States.

29.     For example, a study released in 2001 by 3M Corporation found that PFOA was present in the blood of ninety six percent (96%) of the 598 children tested. The children were located in 23 states.

30.     Studies have indicated that PFOA causes developmental toxicity and other adverse effects in animals.

31.     DuPont has conducted both animal and human studies and tests on PFOA.

32.     DuPont has continually represented to consumers in public statements and documents, in press releases and on its websites that there is no danger posed by PFOA when using cooking products coated with Teflon and has denied and/or failed to disclose the truth that the use of cooking products coated with Teflon can be harmful to human health.

33.     In 1981, however, 3M Corporation, a manufacturer of PFOA, advised DuPont that PFOA may cause birth defects in laboratory animals

34.     Also in 1981, DuPont possessed a document describing the results of a blood sampling study DuPont conducted on eight (8) of its pregnant employees employed at the plant where PFOA is manufactured. This document identified the levels of PFOA in the blood of DuPont's pregnant employees and described the status of the child.

35.     A purpose of DuPont's blood sample study was to monitor these pregnant employees for PFOA exposure, and to monitor umbilical cord blood for the presence of PFOA and to test the babies' blood for the presence of PFOA.

36.     The 1981 document demonstrates the presence of PFOA in the umbilical cord blood of at least one of the eight (8) DuPont employees and in the blood of another worker's baby.  Thus, DuPont knew or should have known from this study that PFOA moved from the mother, through the placenta, to the fetus.

37.     In 1982, DuPont reported data to the EPA regarding the transplacental movement of PFOA in rats. The EPA considered this information to be "substantial risk data."  DuPont failed to disclose to the EPA (or to consumers), however, that it had obtained human blood sampling data in 1981 that confirmed the transplacental movement of PFOA in humans and further failed to disclose to the EPA the information it had about the presence of birth defects (described below) in the babies of its female workers exposed to PFOA.

38.     The EPA contends that DuPont's human blood sampling information demonstrating the transplacental movement of PFOA "reasonably supports the conclusion that PFOA presents a substantial risk of injury to human health."

39.     More specifically, the EPA contends that DuPont's human blood sample data demonstrating that PFOA crosses the human placental barrier between PFOA exposed mothers and their fetuses suggests that the fetuses could experience toxic effects from PFOA, including bioaccumulation and, as observed in animal tests, developmental toxicity and liver toxicity.

40.     The EPA considers DuPont's human blood sampling information that confirms transplacental migration of PFOA "to reasonably support the conclusion of a substantial risk of injury to health or to the environment."

41.     Moreover, the EPA considers DuPont's blood sample data confirming the transplacental movement of PFOA to be "known toxicological information" about PFOA.

42.     Additionally, documents maintained by DuPont chronicling the health of babies born to DuPont workers exposed to PFOA indicate birth defects in two (2) of seven (7) babies. One child had eye and tear duct defects and the second had nostril and eye defects.

43.     Among other things, as a result of DuPont's failure to disclose its 1981 blood sample data to the EPA, the EPA launched an investigation into DuPont's concealment of its study information and determined that DuPont engaged in unlawful behavior by concealing the blood sample study results.

44.     DuPont's concealment of its 1981 blood sample study information may well have altered the continued commercialization of Teflon and the profits received by DuPont from its sale of Teflon. As the EPA pointedly states in its complaint against DuPont contending that DuPont Violated the Federal Toxic Substances Control Act from June 1981 to March 2001 by not reporting health risks

> [the EPA's efforts to investigate the risks posed by PFOA] might have been more expeditious had the data on transplacental movement of the chemical in humans been submitted immediately by DuPont when DuPont obtained the information in 1981.

45.     DuPont has settled the claims brought by the EPA claiming it violated the Federal Toxic Substances Control Act.

46.     In May, 2005, however, a federal grand jury from the Justice Department's Economic Crimes Section issued a subpoena to DuPont regarding DuPont's use of PFOA.

47.     There are numerous additional facts and studies that demonstrate that exposure to PFOA causes adverse health effects. PFOA has been linked to cancer, organ damage, and other negative health effects in tests on laboratory animals. For example, male and female rats and mice have developed several different kinds of tumors when exposed to PFOA.

48.     Various studies have confirmed that exposure to PFOA causes or may cause vascular disease. For example, it is reported that workers exposed to PFOA at 3M's plant in Cottage Grove, Minnesota, demonstrated a statistically significant, elevated risk of dying from cerebrovascular disease.  Findings of vascular disease have also been reported in a study of DuPont workers exposed to PFOA. Additionally, DuPont's study of the blood of its workers demonstrates a statistically significant correlation between cholesterol and PFOA. Similarly, there was also a statistically significant correlation between cholesterol and PFOA found in a study of Italian workers exposed to PFOA. Moreover, there are animal studies showing changes in blood chemistry associated with PFOA exposure that bolster these human study results.

49.     Studies have also shown that exposure to PFOA correlates to incidences of prostate cancer. For example, workers at 3M's Cottage Grove plant exhibited a statistically significant association between the length of workplace PFOA exposure and prostate cancer mortality.  Moreover, an elevated risk of dying from prostate cancer was found among certain workers exposed to PFOA.  Additionally, workers at 3M's Decatur, Alabama plant exhibited an increase in demand for medical care for male reproductive cancers (including prostate) compared

to the general population, with the greatest increases among those workers in the long-time, high-PFOA-exposure category.

50.     There are numerous other studies demonstrating many potential health risks related to exposure to PFOA. Some of these studies include:

(a)     Two analyses of leukemia incidence were conducted from 1956-1989 showing statistically increased odds ratios for workers in DuPont's Washington Works plant from 1956-1989. Additionally, a general mortality study found an increase in leukemia.

(b)     Workers exposed to perfluorochemicals at 3M's Decatur, Alabama plant exhibited significantly increased numbers of episodes of care for intestinal tumors versus those not exposed occupationally. An elevated increase of risk of dying from cancer of the large intestine was also seen in those exposed to PFOA in 3M's Cottage Grove, Minnesota plant compared to the general population.

(c)     At 3M's Cottage Grove, Minnesota plant an elevated risk of dying from pancreatic cancer or pancreatic disease was seen among workers exposed to PFOA versus those not exposed occupationally.

(d)     At 3M's Cottage Grove, Minnesota, plant an elevated risk of dying from cancer of the testis or other male reproductive cancers was seen among workers exposed to PFOA versus those not exposed occupationally.

(e)     A 3M-sponsored animal study found a statistically significant increase in fibroademonas (mammary tumors) correlated with PFOA dose.

(f)     There are also studies that demonstrate PFOA may be related to adverse pituitary effects and immunological function.

51.     Over 40 years ago, DuPont conducted human experiments with Teflon-laced cigarettes to determine why certain workers were becoming sick on the job with a Teflon-related illness commonly called Polymer Fume Fever.  DuPont laced the cigarettes of its volunteers with Teflon and had the volunteers inhale the cigarette fumes until they became sick. In these dosing

experiments up to 90% of the people in the highest dose group became ill for an average of 9 hours, demonstrating flu-like symptoms, including chills, back ache, fever and coughing. These symptoms are commonly linked to Polymer Fume Fever.  DuPont acknowledges that Teflon fumes can sicken people, causing Polymer Fume Fever.

52.     Moreover, apparently aware of the adverse effects in humans of inhaling heated Teflon, DuPont required its employees to wear respirators when working with Teflon heated to 400°F (or more) while in poorly ventilated areas. Experiments demonstrate that when cooking in the home, the surface of a Teflon coated pan can reach this temperature within 2 minutes using a conventional stove top burner set on high.

53.     Reports indicate that a Teflon coated pan reached 721°F in just five minutes under the same test. DuPont studies show that Teflon emits toxic particulates at 446°F. At 680°F Teflon coated pans release at least six toxic gases, including two carcinogens, two global pollutants, and MFA, a chemical lethal to humans at low doses. At temperatures that DuPont scientists claim are reached on stove top drip pans (1000°F), non-stick coatings break sown to a chemical warfare agent known as PFIB, and a chemical analog of the WWII nerve gas phosgene.

54.     For the past fifty (50) years, DuPont has claimed that their Teflon coatings do not emit hazardous chemicals through normal use. In a recent press release, DuPont wrote that "significant decomposition of the coating will occur only when temperatures exceed about 660 degrees F (340 degrees C). These temperatures alone are well above the normal cooking range." Reported tests show, however, that Teflon coated cookware exceeds these temperatures through the common act of preheating a pan on a burner set on high. The toxic particles and gases emitted when Teflon heats and the temperatures at which these particle- and gases are first emitted, follow:

464°F - Ultrafine particulate matter: Teflon produces very small (ultrafine) particles which cause extreme lung damage to rats within 10 minutes of exposure.  Longer exposure causes death.

680°F – Tetrafluoroethylene (TFE):  The National Toxicology Program considers *tetrafluoroethylene* (TFE) to be a "reasonably anticipated" human carcinogen because it is known to cause cancer in laboratory animals.

680°F  - Hexafluoropropene (HFP):  Exposure to fluorocarbons like HFP can lead to eye, nose and throat irritation; heart palpitations, irregular heart rate, headaches, light-headedness, fluid accumulation in the lung and possibly death.  Long-term exposure is associated with decreased motor speed, memory and learning. In mice and rats, inhalation of hexafluoropropene (HFP) causes kidney lesions, decreased numbers of a type of immune cell and increased urination.  HFP also causes increased numbers of chromosomal abnormalities in hamster ovaries.

680°F  - Difluoracetic acid (DFA): Kidney toxicity from DFA has been reported in rats.

680°F  - Monofluoroacetic acid (MFA, fluoroacetic acid or compound 1080): Monofluoroacetic acid is toxic.  Doses as low as 0.7 to 2.1 mg/kg can kill people.  Initially, people report nausea, vomiting, numbness, tingling, anxiety, muscle twitching, low blood pressure and blurred vision.  If exposure is high enough, people can have irregular heart rate, heart attacks and severe convulsions leading to respiratory failure.

680°F  - Perfluorooctanoic acid (PFOA):  The effects of PFOA are discussed throughout this Complaint.

878°F – Silicon tetrafluoride (SiF4):  Silicon tetrafluoride is a highly toxic, corrosive gas.  In the lungs, moisture causes the silicon particles to separate, releasing toxic hydrofluoric acid and also coating the lung with silicon particles.  Inhaling hydrofluoric acid can cause eye and throat irritation, cough, difficult breathing, bluish skin color caused by lack of oxygen, lung damage and fluid accumulation in the lung.  Long term exposure can cause weight loss, decreased numbers of red and white blood cells (anemia and leucopenia), discoloration of the teeth and abnormal thickening of the bone.

887°F – Perfluoroisobutene (PFIB):  Perfluoroisobutene (PFIB) is toxic.  Inhalation can lead to fluid build up in the lung, a condition that can lead to death.  PFIB is listed in the Chemical Weapons

Convention as a *Schedule 2 compound*.  PFIB is many times more toxic than phosgene, a highly toxic corrosive gas also listed as a chemical weapon.

932°F – Carbonyl fluoride (COD2):  Breakdown of Teflon in the air is the major source of carbonyl fluoride exposure.  Carbonyl fluoride is the fluorine version of phosgene, a chlorinated chemical warfare agent.  Carbonyl fluoride fumes can irritate eyes, ears and nose.  More serious symptoms of exposure include chest pains, breathing difficulty, fluid accumulation in the lungs, weakness, liver damage and increased glucose levels.

932°F – Hydrogen fluoride (HF):  Hydrogen fluoride (HF) is a toxic corrosive gas, and can cause death to tissue it comes into contact with, including tissue in the lungs.  Breathing HF can cause severe lung damage, such as fluid buildup in the lungs and inflammation of lung passages.

1112°F – Tribluoroacetic acid fluoride (CF3COF):  Trifluoroacetic acid fluoride is toxic when it breaks down into hydrogen fluoride and trifluoroacetic acid.

1112°F – Octafluorocyclobutane (OFCB):  Inhaling high levels of octafluorocyclobutane can cause heart beat irregularities, unconsciousness and death.  People with pre-existing heart conditions may be extra vulnerable.

55.     The EPA has recently identified significant human health concerns from exposure to PFOA.

56.     On June 27, 2005, a panel of the EPA's Science Advisory Board ("SAB") released a draft of its conclusions after reviewing the EPA's report entitled "Draft Risk Assessment of the Potential Human Health Effects Associated with Exposure to Perfluorooctanoic Acid (PFOA)."

57.     A majority of members of the EPA's SAB concluded that PFOA was likely to cause cancer in humans. The SAB stated:

that the experimental weight of the evidence with respect to the carcinogenicity of PFOA was stronger than [previously determined by the EPA], and suggested that **PFOA is a 'likely' carcinogen in, humans**.  According to the EPA's Guidelines for Carcinogen Risk Assessment (also known as EPA's Cancer Guidelines), this descriptor is typically applied to agents that have tested positive in

more than one species, sex, strain, site or exposure route, with or without evidence of carcinogenity in humans.

58.     A recent Centers for Disease Control study showed that PFOA has contaminated the bloodstream of fetuses throughout the United States.

59.     DuPont executives nonetheless continue to claim that the use of Teflon in cooking products is completely safe.

## VI.     CLASS ACTION ALLEGATIONS

60.     The Representatives seek declaratory, injunctive, and equitable relief on behalf of the Class, to adjudicate: Defendant's liability for its deceptive, unfair, unconscionable and fraudulent misrepresentations and omissions; the class' entitlement to elect rescission, restitution, and/or disgorgement remedies; to establish a court-operated medical monitoring program; the provision of class notice once the parties' rights and liabilities are adjudicated by the Court; and other related forms of equitable relief.

61.     Consequently, a class action is appropriate pursuant to Fed. R. Civ. P. 23 (a), 23(b)(1)(A) and (B) and 23(b)(3).

62.     The Class that Plaintiffs represent is composed of consumers resident in the State of New Jersey who have purchased or otherwise acquired cooking products that are made with or contain Teflon.

63.     If, after notice, more than 100 class members affirmatively elect instead to seek actual damages not incidental to equitable relief, Plaintiffs ask the Court retain jurisdiction to determine at that time whether additional certification pursuant to Rule 23(b)(3) would be necessary or appropriate as to the group of those so election.

64.     The size of the Class is currently unknown but is estimated to be in excess of 10,000,000 consumers.

13

65.     DuPont has knowledge of all licensees authorized to manufacture or sell cookware made with or containing Teflon and the brand and model names so marketed.  Upon information and belief, and subject to information obtainable only through pre-trial discovery, DuPont licensed the use of Teflon to, among others, the following manufacturers and/or models of cookware:

| **MFG** | **MODELS** |
|---|---|
| All Clad | Emerilware<br>LTD<br>Cop-R-Chef<br>Copper-Core<br>MC2 |
| Anolon | Anolon Titanium<br>Advanced<br>Classic<br>Professional<br>Suregrip Bakeware |
| Basic Essentials | |
| Bodum | |
| Chef's Planet | Arc-42 Cookware<br>Tefmat Oven & Bake Liners |
| Circulon | Circulon Total<br>Elite<br>Premier<br>DuPont Autograph<br>Circulon Electrics |
| Cresware | DuPont "Supra Select"<br>Platinum Pro<br>Silverstone Xtra<br>Silverstone Professional |
| Cuisinart | Chef's Classic |
| DuPont | Autograph<br>Platinum Pro<br>Platinum Select<br>Xtra<br>Classic |
| Farberware | Farberware, Inc<br>Farberware Millennium<br>Farberware Nonstick Cookware<br>Select<br>Vibrance |

|  | Cooks Kitchen<br>Classic Series Nonstick Skillets<br>Farberware Nonstick Bakeware |
|---|---|
| GAU |  |
| GSI | Bugaboo |
| Kitchenaid | Gourmet Excellence<br>Gourmet Essentials |
| Megaware Inc. of California | Castalon<br>Castame<br>Triomphe<br>Concorde<br>Magnifica |
| Newell | Calphalon |
| Royal Cougar |  |
| Salton |  |
| Silverstone | Culinary Colors Series<br>Nonstick Stainless Steel Series |
| T-Fal | Jamie Oliver Cookware |
| US Foodservice | Next Day Gourmet |
| Wearever | Mirro<br>Regal<br>Wearever |

66.     The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the Court.

67.     There is a well-defined commonality of interest regarding the questions of law and fact affecting the Class.  Questions of law and fact common to the Class, among others, are whether:

        a.      the class members purchased or otherwise acquired cooking product(s) made with or containing Teflon.

b.      DuPont represented to the public that Teflon or the use of Teflon coated cooking products was safe, and/or failed to disclose that Teflon or the use of Teflon products was unsafe.

c.      DuPont has denied and/or failed to disclose that Teflon or the use of Teflon coated cooking products is or can be potentially harmful to human health.

d.      DuPont had in its possession animal or human test data indicating potential adverse health effects from one or more of the chemicals found in Teflon that DuPont failed to disclose to the consuming public.

e.      DuPont had in its possession blood sample test results of its workers indicating transplacental movement of one of more of the chemicals found in Teflon that DuPont failed to disclose to the consuming public.

f.      DuPont had in its possession data regarding deformities suffered by the children of female DuPont employees that DuPont failed to disclose to the consuming public.

g.      DuPont had in its possession information demonstrating or tending to demonstrate that PFOA may present a risk of injury to human health that DuPont failed to disclose to the consuming public.

h.      the EPA advised DuPont that evidence of transplacental movement of PFOA in laboratory rats was "substantial risk data" that DuPont failed to disclose to the consuming public.

i.      DuPont knew or should have known that the heating of Teflon coated cooking products can cause the release of substances harmful or potentially harmful to human health.

j.      DuPont had in its possession information demonstrating or tending to demonstrate that the heating of Teflon coated cooking products can cause the release of substances harmful or potentially harmful to human health that DuPont failed to disclose to the consuming public.

k.      DuPont knew or should have known that fumes from heated Teflon coated cooking products can sicken people.

l.      DuPont had in its possession information demonstrating or tending to demonstrate that fumes from Teflon coated cooking products can sicken people that DuPont failed to disclose to the consuming public.

m.      the class representatives' claims are sufficiently similar to the claims of prospective class members.

n.      the class plaintiffs no longer want to use their Teflon coated cooking products.

o.      the class members have suffered damages.

68.      These common questions of law and fact are governed by the laws of the State of New Jersey, where Defendant has engaged in its wrongful conduct, and predominate over questions that affect only individual Class Members.

69.      The claims of the Class Representative Plaintiffs are typical of those of the Class. The Class Representative Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in litigation of this nature to represent them. The Class Representative Plaintiffs anticipate no difficulty in the management of this litigation as a Class Action. Accordingly, the Class Representative Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

70.     A class action is the best available method for the fair and efficient adjudication of this controversy. The Members of the Class are so numerous that the joinder of all Members is impracticable, if not impossible. Because the harm suffered by individual Class Members, while not inconsequential, may be relatively small, the expense and burden of individual litigation makes it impractical for Members of the Class to seek redress individually for the wrongful conduct alleged herein. Should each individual Member of the Class be required to bring separate actions, the resulting multiplicity of lawsuits would cause undue hardship and expense on the Court and on the litigants. The prosecution of separate actions would also create a risk of inconsistent rulings which might be dispositive of the interest of other Class Members who are not parties to the adjudications and/or may substantially impede their ability to protect their interests.

71.     To the extent such conditions exist, all conditions precedent to the maintenance of this action have been performed, have occurred, or have otherwise been waived.

## COUNT I
## UNFAIR AND DECEPTIVE TRADE PRACTICES

72.     Plaintiffs incorporate herein by reference all other paragraphs of this Complaint.

73.     This claim is brought pursuant to N.J.A.C. § 56:8-1, *et seq.,* hereinafter referred to as the New Jersey Consumer Fraud Act ("the Act").

74.     The Class Representative Plaintiffs and the Class Members are Persons within the definition of the Act.

75.     Teflon and products containing Teflon are "merchandise" within the scope of the Act.

76.     DuPont has engaged in deceptive and misleading acts or practices in the conduct of its business regarding the sale, distribution, and/or manufacture of Teflon, which acts are unlawful pursuant to the Act.

77.     DuPont's materially deceptive and/or misleading acts or practices constitute consumer-oriented conduct that affected consumers at large.

78.     DuPont's deception involved its failure to disclose to consumers that cooking products containing Teflon were or are potentially harmful to consumers, some of whom are elderly consumers or infants.

79.     DuPont's deception included its failure to disclose to consumers the adverse effects of chemicals contained in Teflon, as demonstrated in numerous third-party studies, as well as DuPont's animal studies, the blood sample data it compiled regarding transplacental movement of chemicals contained in Teflon, and the information regarding the occurrence of birth defects in the children of its female workers.

80.     Exposure to PFOA has caused injuries to humans and animals, but DuPont concealed its knowledge of these potential dangers associated with the use of Teflon from the public and from the EPA in order to deceive consumers into purchasing or otherwise acquiring cooking products containing Teflon, or to pay a price higher than they would have otherwise paid for such products.

81.     DuPont has regularly represented that both Teflon and PFOA are innocuous substances, through, for example, its many advertisements aimed at consumers and otherwise.

82.     DuPont has omitted from its various representations, including advertisements, the true facts concerning the potential dangers associated with the use of Teflon products and PFOA.

83.     DuPont has recently expressed an intention to replace PFOA in the production of Teflon by late 2006.  This fact indicates that DuPont is and/or was aware of the dangers that may be associated with the use of cooking products that have been produced with Teflon and with PFOA.

84.     Furthermore, DuPont has routinely and ubiquitously advertised Teflon cooking products in a variety of media directed at consumers.

85.     DuPont omitted from such advertisements any mention of the facts concerning the adverse effects of chemicals contained in Teflon, which facts were within DuPont's knowledge, and thus the Plaintiffs and the other members of the class were unable to ascertain the true facts concerning the adverse health impacts associated with Teflon.

86.     In engaging in the above actions and/or omissions, Dupont knowingly concealed, suppressed, or omitted facts material to the sale of Teflon.

87.     Due to DuPont's failure to disclose the true facts concerning Teflon in its advertisements, DuPont has committed further violations of the Act.

88.     In engaging in the above actions and/or omissions, DuPont committed an unconscionable commercial practice, deception, fraud, falsity, or misrepresentation in connection with the sale of Teflon.

89.     As a direct and proximate result of the foregoing, the Class Representative Plaintiffs and the other Class members have purchased or otherwise acquired Teflon cooking products that they would not have otherwise purchased or acquired, or paid a price higher than they would have otherwise paid for such products, and thus have been damaged by their purchases and/or acquisitions of Teflon products.

**WHEREFORE**, the Class Representative Plaintiffs, on behalf of themselves and the Class of similarly situated consumers of Teflon products, demand judgment against DuPont and seek injunctive relief requiring Dupont (i) to create a fund for ongoing medical monitoring of consumers who have purchased cooking products containing Teflon; (ii) to create a fund for independent scientific researchers to further investigate the potential for adverse health effects to consumers who have used cooking products containing Teflon; (iii) to cease and desist from the manufacture, distribution, and sale of cooking products containing Teflon; (iv) to replace and/or exchange all existing products containing Teflon possessed by Class members with similar products containing non-hazardous "non-stick" cooking substances, or the monetary equivalent thereof; and (v) to pay plaintiffs an award of compensatory damages, punitive damages, interest, costs, and attorneys' fees, and the civil penalties as allowed by statute, and to award other and further relief as this Court deems just and proper.

## COUNT II
## FRAUDULENT MISRESPRESENTATION BY OMISSION

90.     Plaintiffs incorporate herein by reference all other paragraphs of this Complaint.

91.     DuPont knew or recklessly disregarded the true nature of the adverse effects of the chemicals contained in Teflon, which adverse effects DuPont knew made Teflon unsafe for use by consumers.

92.     DuPont knew or recklessly disregarded the adverse effects of chemicals contained in Teflon, as demonstrated in numerous third-party studies, as well as DuPont's animal studies, the blood sample data it compiled regarding transplacental movement of chemicals contained in Teflon, and the information regarding the occurrence of birth defects in the children of its female workers.

93.     DuPont knew or recklessly disregarded that exposure to PFOA has caused injuries to humans and animals, but DuPont concealed its knowledge of these potential dangers associated with the use of Teflon from the public and from the EPA in order to deceive consumers into purchasing or otherwise acquiring cooking products containing Teflon, or to pay a price higher than they would have otherwise paid for such products.

94.     Although DuPont knew or recklessly disregarded the true facts concerning the adverse health effects of using Teflon products, DuPont failed to disclose to consumers and the general public, through uniform misbranding, concealment, and non-disclosure, and through information prepared or disseminated by DuPont, the true facts concerning the adverse health risks associated with the use of Teflon products.

95.     DuPont continued to manufacture, create, design, package, market, sell, advertise, and/or otherwise distribute Teflon products for use by consumers, while knowingly failing to disclose the adverse health effects associated with Teflon.

96.     DuPont has recently expressed an intention to replace PFOA in the production of Teflon by late 2006.  This fact indicates that DuPont was aware of the dangers that may be associated with the use of cooking products that have been produced with Teflon and with PFOA.

97.     As a consequence of DuPont's fraudulent conduct, DuPont knew of, appreciated, and accepted and retained substantial monetary benefits, which monetary benefits were obtained from the Plaintiffs and the other members of the Class.

98.     In their decision to purchase, acquire, and/or use Teflon products, Plaintiffs relied to their detriment on DuPont's failure to disclose material information.

99.     In their decision to purchase, acquire, and/or use Teflon products, Plaintiffs relied to their detriment on the public image and reputation of DuPont's Teflon product that resulted from DuPont's advertising and public relations campaigns directed at the consuming public.

100.     As a result of the foregoing knowing or reckless material fraudulent omissions by DuPont, the Class Representatives and the other members of the Class could not have known of the health-related dangers associated with Teflon's use, and were caused and/or induced to purchase or otherwise acquire Teflon cooking products that they would not have otherwise purchased or acquired, or paid a price higher than they would have otherwise paid for such products, and thus have been damaged through and by their purchases and/or acquisitions of Teflon products.

**WHEREFORE**, the Class Representative Plaintiffs, on behalf of themselves and the Class of similarly situated consumers of Teflon products, demand judgment against DuPont and seek injunctive relief requiring Dupont (i) to create a fund for ongoing medical monitoring of consumers who have purchased cooking products containing Teflon; (ii) to create a fund for independent scientific researchers to further investigate the potential for adverse health effects to consumers who have used cooking products containing Teflon; (iii) to cease and desist from the manufacture, distribution, and sale of cooking products containing Teflon; (iv) to replace and/or exchange all existing products containing Teflon possessed by Class members with similar products containing non-hazardous "non-stick" cooking substances, or the monetary equivalent thereof; and (v) to pay plaintiffs an award of compensatory damages, punitive damages, interest, costs, and attorneys' fees, and the civil penalties as allowed by statute, and to award other and further relief as this Court deems just and proper.

## COUNT III
## NEGLIGENT MISREPRESENTATION BY OMISSION

101.    Plaintiffs incorporate herein by reference all other paragraphs of this Complaint.

102.    DuPont negligently concealed from consumers the true nature of the adverse effects of the chemicals contained in Teflon, which adverse effects made Teflon unsafe for use by consumers.

103.    DuPont knew or should have known, among other things, of the adverse effects of chemicals contained in Teflon, as demonstrated in numerous third-party studies, as well as DuPont's animal studies, the blood sample data it compiled regarding transplacental movement of chemicals contained in Teflon, and the information regarding the occurrence of birth defects in the children of its female workers.

104.    DuPont knew or should have known, among other things, that exposure to PFOA has caused injuries to humans and animals, but DuPont concealed its knowledge of these potential dangers associated with the use of Teflon from the public and from the EPA in order to deceive consumers into purchasing or otherwise acquiring cooking products containing Teflon.

105.    DuPont had a duty to disclose but failed to disclose to Plaintiffs and the other members of the class the adverse effects which made Teflon unsafe for use by consumers.

106.    These material omissions by DuPont were negligently withheld from consumers and the general public through uniform misbranding, concealment, and non-disclosure, through mass media and point-of-sale advertising, and through other information prepared or disseminated by DuPont.

107.    By continuing to manufacture, create, design, package, supply, market, sell, advertise, and otherwise distribute Teflon for use by consumers, while failing to disclose to

consumers the adverse health effects associated with Teflon, DuPont negligently misrepresented that Teflon was fit for use, was merchantable, and was reasonably safe for its intended purpose.

108.    DuPont has recently expressed an intention to replace PFOA in the production of Teflon by late 2006.  This fact indicated that DuPont was aware of or negligently disregarded that dangers that may be associated with the use of cooking products that have been produced with or contained Teflon and PFOA.

109.    As a result of the foregoing negligent material omissions by DuPont, the Class Representatives and the other members of the Class could not have known of the health-related dangers associated with Teflon's use, and purchased or otherwise acquired Teflon cooking products that they would not have otherwise purchased or acquired, or paid a price higher than they would have otherwise paid for such products, and thus have been damaged through and by their purchases and/or acquisitions of Teflon products.

**WHEREFORE**, the Class Representative Plaintiffs, on behalf of themselves and the Class of similarly situated consumers of Teflon products, demand judgment against DuPont and seek injunctive relief requiring Dupont (i) to create a fund for independent scientific researchers to further investigate the potential for adverse health effects to consumers who have used cooking products containing Teflon; (ii) to cease and desist from the manufacture, distribution, and sale of cooking products containing Teflon; (iii) to replace and/or exchange all existing products containing Teflon possessed by Class members with similar products containing non-hazardous "non-stick" cooking substances, or the monetary equivalent thereof; and (iv) to pay plaintiffs an award of compensatory damages, punitive damages, interest, costs, and attorneys' fees, and the civil penalties as allowed by statute, and to award other and further relief as this Court deems just and proper.

## COUNT IV
## UNJUST ENRICHMENT

110.    Plaintiffs incorporate herein by reference all other paragraphs of this Complaint.

111.    Plaintiffs and the other members of the class purchased or otherwise acquired cooking products made with or containing Teflon, without understanding the true nature of the health hazards associated with Teflon's use.

112.    DuPont knew but failed to disclose the true facts concerning the adverse health risks associated with Teflon, which health risks rendered Teflon unfit and unsafe when sold and used as intended by Plaintiffs and the other members of the class.

113.    As a result of DuPont's failure to disclose the true facts concerning the adverse health risks associated with Teflon, which health risks rendered Teflon unfit and unsafe when sold and used as intended by Plaintiffs and the other members of the class purchased or otherwise acquired Teflon cooking products that they would not have otherwise purchased or acquired, or paid a price higher than they would have otherwise paid for such products.

114.    As a consequence of DuPont's conduct, substantial monetary benefits were conferred upon DuPont, which benefits DuPont knew of and appreciated, and accepted and retained.

115.    By virtue of the foregoing, DuPont was unjustly enriched at the expense of Plaintiffs and the other members of the Class in any amount yet to be determined.

116.    Based on such wrongdoing by DuPont, it is against equity and good conscience to permit DuPont to retain the monetary value of the Teflon products which were purchased or otherwise acquired by the Plaintiffs and the other members of the class.

117.    As a direct result of DuPont's wrongdoing, the Plaintiffs and the other members of the Class have purchased or otherwise acquired Teflon cooking products that they would not

have otherwise purchased or acquired, or paid a price higher than they would have otherwise paid for such products, and thus have been damaged through and by their purchases and/or acquisitions of Teflon products; and, consequently, DuPont should disgorge the monetary value of the Teflon products which were sold to or otherwise acquired by the Plaintiffs and the other members of the class.

## COUNT V
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

118.    Plaintiffs incorporate herein by reference all other paragraphs of this Complaint.

119.    Dupont is a merchant who deals in the manufacture, sale and distribution of Teflon and goods and products containing Teflon.

120.    Dupont has knowledge, skill and information peculiar to the manufacture, sale and distribution of Teflon and goods and products containing Teflon.  In fact, its knowledge of the dangerous propensities of Teflon have, until recently, been unique to it.

121.    As stated above, one or more defects or unreasonably dangerous conditions existed at the time Teflon left Dupont.  Accordingly, they were not fit for the ordinary purposes for which such goods are used, were not of even kind and quality of other cookware products and were inadequately packaged and labeled.

122.    The Teflon products sold by Dupont fail to perform in the way that goods of like kind should perform in that they emit noxious fumes and vapors when used as intended, which are known carcinogens and which may pose a risk to human health.

123.    Plaintiffs and the members of the Class have purchased cookware containing Teflon for use in a manner that Dupont intended or should reasonably have foreseen.

124.    By manufacturing, selling and/or distributing Teflon containing one or more defects or unreasonably dangerous conditions, or by failing to warn against those defects and

conditions, or both, Dupont has breached the implied warranty of merchantability set forth in N.J.S.A. § 12A:2-314, thereby causing harm to the Plaintiffs and members of the Class.

125.    The acts and omissions set forth above were knowing and intentional, thereby subjecting Dupont to all punitive and exemplary damages permitted by law.

## COUNT VI
## BREACH OF IMPLIED WARRANTY OF FITNESS FOR PARTICULAR PURPOSE

126.    Plaintiffs incorporate herein by reference all other paragraphs of this Complaint.

127.    At the time that Dupont manufactured and thereafter sold and distributed Teflon, Dupont had reason to know how Plaintiffs and the Class Members intended to use Teflon-coated pots, pans and other cooking utensils.  Further, Dupont had reason to know that the Plaintiffs and the Class Members were relying on, and did rely on, Dupont's skill, judgment and superior knowledge, as the product manufacturer, when they purchased Teflon-coated cookware.

128.    Accordingly, Dupont has breached the implied warranty of fitness for particular purpose set forth in N.J.S.A. § 12A:2-315, thereby causing harm to the Plaintiffs and the members of the Class.

129.    The acts and omissions set forth above were knowing and intentional, thereby subjecting Dupont to all punitive and exemplary damages permitted by law.

**WHEREFORE**, the Class Representative Plaintiffs, on behalf of themselves and the Class of similarly situated consumers of Teflon products, demand judgment against DuPont and seek injunctive relief requiring Dupont (i) to create a fund for ongoing medical monitoring of consumers who have purchased cooking products containing Teflon; (ii) to create a fund for independent scientific researchers to further investigate the potential for adverse health effects to consumers who have used cooking products containing Teflon; (iii) to cease and desist from the manufacture, distribution, and sale of cooking products containing Teflon; (iv) to replace and/or

exchange all existing products containing Teflon possessed by Class members with similar products containing non-hazardous "non-stick" cooking substances, or the monetary equivalent thereof; and (v) to pay plaintiffs an award of compensatory damages, punitive damages, interest, costs, and attorneys' fees, and the civil penalties as allowed by statute, and to award other and further relief as this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby request trial by jury of all issues so triable as a matter of law.

Respectfully submitted,

KLEHR HARRISON HARVEY BRANZBURG &
ELLERS LLP
*Counsel for Plaintiffs*
457 Haddonfield Road, Suite 510
Cherry Hill, NJ 08002-2220

KLUGER, PERETZ, KAPLAN & BERLIN, P.L.
*Counsel for Plaintiffs*
Miami Center, 17th Floor
201 South Biscayne Boulevard
Miami, Florida 33131
Telephone:    (305) 379-9000
Facsimile:    (305) 379-3428

Kimberley K. Baer      PK0014675
Steven P. Wandro       PK0008439
WANDRO, BAER & APPEL, P.C.
*Counsel for Plaintiffs*
2501 Grand Avenue, Suite B
Des Moines, Iowa 50312
Telephone:    515/281-1475
Facsimile:    515/281-1474

By:___s/ Kimberley K. Baer_____
         Kimberley K. Baer, Esq.

29

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished via Electronic Mail and a true and correct copy of the Certificate of Service (only) furnished via U.S. Mail to: **Adam L. Hoeflich, Esq.**, (adam.hoeflich@bartlit-beck.com) Bartlit Beck Herman Palenchar & Scott LLP, 54 W. Hubbard Street, Chicago, IL 60610l; **Robert Fanter, Esq.**, (fanter@whitfieldlaw.com) Whitfield & Eddy 317 Sixth Avenue, Suite 1200, Des Moines, Iowa 50309 and **John Sherk, Esq.**, (jsherk@shb.com) Shook Hardy & Bacon LLP, 2555 Grand Blvd., Kansas City, MO 64108  this 8th day  of May 2006.

By:  s/ Kimberley K. Baer
        Kimberley K. Baer, Esq.